**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CURIUM US LLC,
111 Westport Plaza Dr., Suite 800
Maryland Heights, MO 63146,

*Plaintiff*,

v.

MEHMET OZ, in his official capacity, and U.S. CENTERS FOR MEDICARE & MEDICAID SERVICES,
7500 Security Boulevard
Baltimore, MD 21244,

and

CHRIS WRIGHT, in his official capacity, and U.S. DEPARTMENT OF ENERGY,
1000 Independence Ave., SW
Washington, DC 20585

*Defendants*.

Civil Action No. 26-cv-3840

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Two federal agencies—the Department of Energy (DOE) and the Centers for Medicare & Medicaid Services (CMS)—have recently relied on inapposite statutory authority to take unlawful, arbitrary, and capricious actions that have upended the market for molybdenum-99 (Mo-99), a radioisotope precursor vital to the U.S. healthcare system's capacity to diagnose heart disease, cancer, and other diseases. Mo-99 is primarily used to make the "daughter" isotope technetium-99m (Tc-99m), which is in turn used to make tens of millions of nuclear medicine doses for diagnostic imaging procedures annually. The agency actions at issue combine to form a misguided and potentially dangerous effort to boost a single company's unproven method of producing Mo-99, and ultimately "corner" the Tc-99m market in the United States.

2. For decades, Plaintiff Curium US LLC (Curium) has been the leading domestic producer of Tc-99m generators, employing approximately 700 people across the United States, including notable facilities in Missouri and Indiana. But in April 2026, DOE invoked statutory authority intended to promote energy infrastructure to instead award a quarter-billion-dollar direct loan to Curium's chief competitor, SHINE Technologies (SHINE), to fund construction of a facility that will produce no energy at all.

3. Meanwhile, on November 25, 2025, CMS—at DOE's behest—published a new Medicare add-on payment for Tc-99m derived from "domestically produced" Mo-99, such that hospitals will receive a separate payment when they use a qualifying Tc-99m dose in diagnosing patients. By adopting DOE's gerrymandered definition of Tc-99m derived from "domestically produced" Mo-99, CMS has now ensured that, based on the present circumstances, *only* the Tc-99m generators that SHINE produces using Mo-99 it hopes to someday make at its new DOE-

subsidized facility will qualify, thereby making it impossible for Curium (or anyone without access to SHINE's Mo-99) to compete.

4. Both actions exceeded the respective agencies' statutory authority and were arbitrary and capricious in numerous ways. Under the Energy Dominance Financing Program authorized by the Energy Policy Act, 42 U.S.C. § 16517, DOE may *guarantee* third-party loans for projects that increase the output of energy infrastructure or the stability of the electrical grid. But Congress was clear that such loan guarantees were available "only for projects" that meet the statute's subject-matter requirements and surmount enumerated procedural hurdles. And the statute authorizes loan guarantees, not *direct* loans to private parties.

5. In approving the SHINE loan, DOE violated the Energy Policy Act multiple times over. Neither DOE nor SHINE has ever suggested that the project would have *any* impact on energy production or energy infrastructure, as the underlying statute demands. To the contrary, DOE was clear that the project was intended to boost production of Mo-99 for medical use. *See DOE's Office of Energy Dominance Financing Announces Conditional Commitment for a Domestic Medical Isotope Manufacturing Facility* (DOE Press Release), Dep't of Energy (Apr. 9, 2026), https://perma.cc/5KWS-RKNE. And the loan was issued without having cleared the procedural safeguards that Congress put in place, including the requirement that the Secretary "certify that political influence did not impact the selection of the project." 42 U.S.C. § 16512(r).

6. The add-on payment violates CMS's similarly circumscribed statutory authority. As relevant, Section 1833(t)(2)(E) of the Social Security Act, 42 U.S.C. § 1395*l*(t)(2)(E), authorizes CMS to make adjustments to ensure hospitals receive equitable payments under the Medicare Hospital Outpatient Prospective Payment System (OPPS). But there is no payment inequity here for CMS to correct. Hospitals are free to acquire Tc-99m doses from any source they

choose, and Medicare pays them the same amount for the same diagnostic procedure regardless of where the underlying Mo-99 was irradiated. And because nuclear pharmacies, not hospitals, by and large purchase Tc-99m generators and sell the Tc-99m radiolabeled doses to hospitals at industry-standard prices, whether a dose was derived from domestically- or foreign-irradiated Mo-99 would make no difference to the cost that hospitals pay. Absent such a difference, Section 1833(t)(2)(E) does not permit CMS to leverage add-on payments to achieve another agency's unrelated policy objectives—like stimulating domestic manufacturing or redressing a purported "barrier to entry" for "U.S. companies."

7. Both the DOE loan and CMS add-on payment exceed the agencies' statutory authority and were adopted without the reasoned decisionmaking the Administrative Procedure Act demands. Neither agency examined the relevant data, considered the competitive harm to existing market participants, or provided a reasoned explanation for its decision. And both agencies were transparent that their purpose in taking these actions was to establish domestic capacity for producing Mo-99 (used only in medical applications), rather than to advance the statutory objectives with which they were charged: namely, ensuring reliable energy output or equitable Medicare payments.

8. The consequences will fall not only on Curium, but also on American patients. Taken together, the challenged actions threaten to destabilize a supply chain that 20 million Americans depend on annually for time-sensitive cardiac, cancer, and pulmonary diagnoses, with no reliable domestic alternative in place. The Court should hold the DOE loan and CMS add-on payment unlawful and set them aside.

## JURISDICTION AND VENUE

9. This action arises under, and asserts violations of, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., the Energy Policy Act, 42 U.S.C. § 15801 *et seq*., and the Social Security Act, 42 U.S.C. § 301 *et seq.* This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 5 U.S.C. §§ 701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

10. DOE's decision granting an Energy Dominance Financing Program loan to SHINE and CMS's final rule establishing the add-on payment are final agency actions that are judicially reviewable under the APA. *See* 5 U.S.C. §§ 704, 706.

11. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

12. Plaintiff Curium US LLC is a Delaware limited liability company with a principal place of business at 111 Westport Plaza Dr., Suite 800, Maryland Heights, MO 63146. Curium is the leading domestic producer of Tc-99m generators for radiopharmaceutical purposes.

13. Defendant Mehmet Oz is the Administrator of the Centers for Medicare & Medicaid Services. He has ultimate responsibility for oversight of CMS's activities, including with regard to the agency rulemaking concerning Medicare add-on payments. He is being sued in his official capacity only. Administrator Oz maintains an office at 7500 Security Boulevard, Baltimore, MD 21244.

14. Defendant CMS is an administrative agency within the executive branch of the United States government. CMS is headquartered in Baltimore, Maryland.

15. Defendant Chris Wright is the Secretary of Energy. He has ultimate responsibility for oversight of Department of Energy activities, including DOE's approval of loans under the Energy Dominance Financing Program. He is being sued in his official capacity only. Secretary Wright maintains an office at 1000 Independence Ave., SW, Washington, DC 20585.

16. Defendant DOE is an executive department of the United States government. DOE is headquartered in Washington, DC.

## FACTUAL AND LEGAL ALLEGATIONS

***Curium Leads Domestic Production of Tc-99m Generators for Radiopharmaceutical Purposes***

17. Curium US LLC is a manufacturer of radiopharmaceutical products used for diagnostic imaging of cancer, heart disease, bone conditions, and brain disease. Curium employs approximately 700 people at facilities in Missouri and Indiana, making it one of the largest domestic radiopharmaceutical employers in the United States. Curium's products include Tc-99m generators, along with many diagnostic imaging agents, including Detectnet® (copper Cu 64 dotatate injection), the first commercially available Cu-64 diagnostic agent in the United States. Curium has been the leading domestic supplier of Tc-99m generators for radiopharmaceutical purposes for many years.

18. Because Tc-99m has a short radioactive half-life of just six hours, manufacturers, including Curium, supply it to radiopharmacies in the form of Tc-99m generators, containing the parent radionuclide, Mo-99. Those generators allow radiopharmacies—in a process referred to as "elution"—to extract Tc-99m from decaying Mo-99 within the generator (which has a significantly longer half-life of 67 hours). The radioactive Tc-99m is combined in a nuclear pharmacy with

other "cold" components in a process called "radiolabeling" to prepare patient-ready doses of diagnostic imaging agents near the hospitals where those products are used for diagnostic procedures. Nuclear pharmacies then sell the radiolabeled doses to hospitals in transactions separate from the generator sale. Curium-sourced diagnostic imaging products are used in approximately 80,000 procedures daily throughout the United States, supporting diagnoses of heart disease, cancer, and pulmonary conditions for approximately 20 million American patients each year. Letter from Cathy Sue Cutler, President, Soc'y of Nuclear Med. & Molecular Imaging, to Stephen Astle, Dir., Def. Indus. Base Div., Off. of Strategic Indus. & Econ. Sec., Bureau of Indus. & Sec., U.S. Dep't of Com. 1 (May 6, 2025) (commenting on Section 232 National Security Investigation of Imports of Pharmaceuticals and Pharmaceutical Ingredients).

19. To produce these Tc-99m generators, Curium first sources uranium domestically, exclusively from Oak Ridge National Laboratory in Tennessee. It then irradiates uranium "targets" at one of several research reactors in Europe, which are among the few nuclear reactors worldwide with the capacity and capability to produce Mo-99 at scale. This includes reactors in Poland, the Netherlands, and Belgium. After approximately one week of irradiation inside the reactor, the uranium targets are sent to a Curium processing facility to extract Mo-99. For U.S. Tc-99m generator production, the processed Mo-99 is shipped to Curium's plant in St. Louis and loaded into the specially designed Tc-99m generators manufactured there. Several days per week fresh Tc-99m generators are shipped to replenish radiopharmacies around the country, which in turn elute Tc-99m to prepare finished doses for patients. In other words, while the limited availability of American nuclear reactors requires Curium to irradiate and process its uranium targets in Europe, every other step of Curium's manufacturing process occurs in the United States.

20. Curium maintains long-term agreements with these European research reactors, providing the United States with a resilient, diversified Mo-99 supply chain that has reliably served approximately 20 million American patients annually. Curium sells its Tc-99m generators to radiopharmacies located around the country.

21. Curium's principal domestic competitor is SHINE, a Wisconsin-based company that has been attempting for many years to develop domestic Mo-99 production using a solution reactor process at its "Chrysalis" facility in Janesville, Wisconsin. Despite these years of effort, SHINE has never produced any commercial Mo-99 at its facility. SHINE's construction permit has been extended twice, most recently to December 31, 2029. Since 2010, SHINE has received at least $143 million in DOE NNSA cooperative agreement grants.

22. In early 2026, SHINE acquired the "SPECT" business of Lantheus Holdings, the only other significant competitor in the domestic Tc-99m generator market. The acquisition immediately gives SHINE a vertically integrated position and an existing, ready-made market share: if it begins producing Mo-99 at the Chrysalis facility, it could load that Mo-99 into the existing (formerly Lantheus) Tc-99m generators. *See SHINE Completes Acquisition of Lantheus SPECT Business*, SHINE Techs. (Jan. 2, 2026), https://perma.cc/5VLF-6H9P.

***<u>Federal Agencies Take Two Coordinated Actions to Advantage SHINE at Curium's Expense</u>***

23. Within the past year, CMS and DOE have taken coordinated actions that combine to upend the competitive landscape and supply chain for Tc-99m generators and threaten Curium's ability to remain a viable supplier to the United States market.

24. First, DOE announced an unprecedented quarter-billion-dollar direct loan for SHINE to complete its Chrysalis facility. *See* DOE Press Release, *supra*. In so doing, DOE relied on statutory authorities allowing loan guarantees for projects that increase the capacity or reliability of American energy infrastructure, with no mention by Congress of medical

radioisotopes. *Id.*; *see* 42 U.S.C. § 16517. Yet DOE announced in its press release that the purpose of the loan to SHINE was to increase the supply of medical radioisotopes, not energy.

25. In fact, the Chrysalis facility, once constructed, will produce no energy at all.

26. Second, at DOE's request, CMS adopted a Medicare add-on payment—that is, an additional payment to hospitals for furnishing Tc-99m radiolabeled doses which are derived from "domestic" Mo-99. The add-on payment gives hospitals an additional $10 in Medicare payment for each qualifying dose—a per-dose advantage that attaches even though the cost of a Tc-99m radiolabeled dose is generally packaged into the payment for the diagnostic procedure. 42 C.F.R. § 419.49. The add-on payment is sufficient to make Tc-99m generators that fail to qualify for the add-on payment commercially nonviable. Although the majority of Curium's Tc-99m generator production process takes place domestically, CMS's final rule announced a standard for "domestic" production gerrymandered to include only SHINE's Mo-99 produced at its Chrysalis facility—and, currently, no one else's. To that end, it specifically excludes Tc-99m derived from Mo-99 irradiated outside the United States, even if the uranium is domestically sourced, and both production of the Tc-99m generator and elution of Tc-99m occur domestically. *Id.* § 419.49(b).

27. Together, the DOE loan and CMS add-on payment stack the deck for SHINE and make it impossible for Curium (or any other Tc-99m generator producer) to compete in the United States market. If allowed to stand, those actions all but guarantee that—barring significant changes in the market for domestic production of Mo-99—the entire domestic Tc-99m generator supply chain will depend on SHINE's Chrysalis facility and its untested solution-reactor-based process.

**The DOE Loan**

28. Under the Energy Policy Act, DOE may make a "loan guarantee" for defined projects related to energy infrastructure. 42 U.S.C. § 16511(4)(A); *see, e.g.*, *id.* § 16512(b). In

addition to funds available for various renewable energy and pollution reduction projects, Congress in 2025 appropriated an additional $1,000,000,000 in funding for loan guarantees under the Energy Dominance Financing Program. *See* One Big Beautiful Bill Act of 2025, Pub. L. No. 119-21, tit. V, § 50403(a), 139 Stat. 72, 152 (codified at 42 U.S.C. § 16517).

29. Under the Energy Dominance Financing Program, DOE "may make guarantees, including refinancing, … only for projects that[] (1) retool, repower, repurpose, or replace energy infrastructure that has ceased operations; (2) enable operating energy infrastructure to increase capacity or output; or (3) support or enable the provision of known or forecastable electric supply at time intervals necessary to maintain or enhance grid reliability or other system adequacy needs." 42 U.S.C. § 16517(a). Consistent with DOE's statutory purview, the only projects eligible for loan guarantees under the Energy Dominance Financing Program are those that relate to energy production.

30. Other provisions of the Energy Policy Act likewise authorize loan guarantees only for energy-infrastructure projects and are limited to projects that, among other requirements, "avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases." *Id.* § 16513(a).

31. The Energy Policy Act does not authorize direct loans or any other direct disbursement of funds to non-federal borrowers. A loan "guarantee" as defined in the Act means just that: "any guarantee, insurance, or other pledge with respect to the payment of all or a part of the principal or interest on any debt obligation of a non-Federal borrower to a non-Federal lender." 2 U.S.C. § 661a(3); *see* 42 U.S.C. § 16511(4)(A) (defining a "guarantee" to mean a "loan guarantee" as defined in Section 661a). Unlike a "direct loan," under which an agency provides "a disbursement of funds … to a non-Federal borrower," 2 U.S.C. § 661a(1), a loan guarantee merely

guarantees a borrower's existing private loan in the event the borrower defaults. *See* 42 U.S.C. § 16512(g).

32. The Act also prescribes both procedural and substantive safeguards that apply to all Energy Policy Act loan guarantees, including those made under the statute's energy dominance financing provisions. *See id.* § 16512. Among other requirements, the statute mandates a certification to ensure that DOE's project selection is free from any conflicts of interest: "For each project selected for a guarantee under this subchapter, the Secretary shall certify that political influence did not impact the selection of the project." *Id.* § 16512(r).

33. On April 9, 2026, DOE announced "a conditional commitment for a loan of up to $263 million to SHINE Chrysalis, LLC (SHINE) to support the construction of Chrysalis, a high-volume medical isotope production facility in Janesville, Wisconsin." DOE Press Release, *supra*. As characterized in DOE's press release, the Chrysalis facility "will create a supply of reliable and secure medical isotopes"—namely, "molybdenum-99 (Mo-99)." *Id.* Although the "Loan Summary" available on the government's USASpending website cites the Energy Policy Act's renewable energy provisions, DOE's press release states that the loan was made by the agency's Office of Energy Dominance Financing under its mandate to "restore American Energy Dominance." *Id.*; *see Loan Summary*, USASpending.gov, https://perma.cc/CWJ2-8NJW. The press release refers to the loan as a direct loan to SHINE rather than a guarantee of any existing private loan. DOE Press Release, *supra*.

34. Nowhere does DOE's press release mention energy production, and the SHINE facility—even once completed—will produce no energy whatsoever. Instead, SHINE's Mo-99 production process uses a subcritical (meaning non-self-sustaining) fusion reaction solely to generate neutrons used to bombard a uranyl nitrate solution, thereby producing Mo-99 for medical

purposes along with various unusable chemical byproducts. Neither the Chrysalis facility nor the fusion reaction it will house does anything to "retool" energy infrastructure, "enable" increased productivity by existing infrastructure, or contribute in any other way to producing energy that is returned to the electrical grid. Nor does DOE's press release identify any role the Chrysalis facility will play in avoiding, reducing, utilizing, or sequestering air pollutants or greenhouse gas emissions, as required for loan guarantees under the Energy Policy Act's renewable energy provisions.

35. To justify its direct loan to SHINE, DOE cited various policy goals unrelated to energy production. It stated, for example, that most Mo-99 supply "comes from overseas with limited capacity to meet demand" and that the facility would support a "domestic supply chain [for Mo-99] while lowering costs." DOE Press Release, *supra.* It further stated that the "project will support hundreds of construction and operation jobs, contributing to a strong next-generation American nuclear workforce." *Id.*

36. No other radiopharmaceutical manufacturers have received a loan or loan guarantee under the Energy Dominance Financing Program.

37. On information and belief, the Secretary of Energy has not issued any certification that "political influence did not impact the selection" of the Chrysalis project for a DOE loan. 42 U.S.C. § 16512(r).

**The CMS Add-On Payment Rule**

38. Medicare Part B covers outpatient hospital services through the Hospital OPPS, established under Section 1833(t) of the Social Security Act, 42 U.S.C. § 1395*l*(t). The OPPS is a prospective payment system in which CMS sets fixed payment amounts for groups of covered services based on their relative cost through annual notice-and-comment rulemaking.

39. Congress enacted the OPPS to control costs and maximize efficiencies.

40. Under the OPPS, Medicare pays fixed, predetermined rates for groups of covered outpatient services. 42 U.S.C. § 1395*l*(t)(1)-(2). These rates reflect statistically derived relative resource weights calculated from hospital claims and cost report data. CMS must review and revise the service groups, relative payment weights, and adjustments at least annually to account for changes in medical practice, technology, new services, and new cost data. *Id.* § 1395*l*(t)(9)(A). In making those revisions, CMS must consult an expert outside advisory panel on the clinical integrity of the groups and weights. *Id.*

41. Section 1395*l*(t)(2)(E) authorizes CMS to craft limited adjustments under the prospective payment system. Such adjustments include "outlier adjustments"; "transitional pass-through payments"; "temporary additional payments for non-opioid treatments for pain relief"; and "other adjustments as determined to be necessary to ensure equitable payments, such as adjustments for certain classes of hospitals." *Id.* § 1395*l*(t)(2)(E). Consistent with Congress's cost-controlling purpose, and as its context makes clear, the equitable adjustment authority in Section 1395*l*(t)(2)(E) permits CMS to adjust OPPS payment rates to correct disparities in reimbursement, such as where "certain classes of hospitals" incur higher costs than others.

42. None of these adjustments includes conditioning payment on the geographic origin of an input; instead each responds to a demonstrated cost difference in the covered service itself. For example, transitional pass-through payments are designed to prevent financial disincentives for the use of certain innovative drugs and biologicals that otherwise would be paid a rate significantly below the costs of the items. *See id.* § 1395*l*(t)(6)(A)(iv) (making pass-through payments available for new drugs or biologicals whose costs are "not insignificant" in relation to the OPPS payments for associated procedures). Similarly, the non-opioid adjustment requires

CMS to unpackage qualifying non-opioid therapies (which otherwise would be packaged with the underlying surgical procedure and included in the procedure payment rate) and provide payments designed to make the use of those therapies economical. This serves to counter the unintended consequence of the OPPS packaging policy, which can make the use of more costly alternative, non-opioid treatment options cost-prohibitive for hospitals.

43. On July 22, 2024, CMS issued a proposed rule and, using its "equitable adjustment authority" under Section 1395*l*(t)(2)(E), proposed to adopt an OPPS add-on payment for Tc-99m doses derived from domestically produced Mo-99. 89 Fed. Reg. 59,186, 59,377-78 (July 22, 2024). CMS explained that the impetus for the proposed payment was that "the Department of Energy" had "raised an[] issue affecting the domestic supply chain for Mo-99 and Tc-99[m]." *Id.* at 59,378. Specifically, purported foreign government support for Mo-99 production created "a barrier to entry for new producers, including U.S. companies." *Id.* In CMS's view, this amounted to a "payment inequity," because the prices hospitals paid for Tc-99m produced with Mo-99 irradiated outside the United States did not account for "the true cost of production." *Id.* CMS did not identify any specific foreign government subsidy, or any data, supporting its assertion that prices for foreign-irradiated Mo-99 fell below the true cost of production. *See id.* at 59,377-78.

44. Later that year, CMS issued the Calendar Year (CY) 2025 OPPS Final Rule, adopting the add-on payment and setting its effective date as January 1, 2026. 89 Fed. Reg. 93,912 (Nov. 27, 2024). That rule did not define which Tc-99m doses would qualify for the add-on payment. Instead, CMS left to DOE the task to "establish the criteria to certify whether the Tc-99m radiopharmaceutical dose is domestically produced and eligible for the add-on payment," to be incorporated in the following year's rulemaking. *Id.* at 94,257.

45. The next July, CMS issued a proposed rule that, for the first time, defined what it means for a dose of Tc-99m to be "domestically produced" such that it qualifies for the add-on payment. 90 Fed. Reg. 33,476, 33,652-53 (July 17, 2025). Based on DOE's recommendation, which CMS adopted without any independent reasoning, CMS announced that a dose would qualify only if produced from at least 50% Mo-99 that was "both irradiated and processed in the United States." *Id.* at 33,652. CMS explained that this definition would exclude Tc-99m produced from Mo-99 targets irradiated outside the United States, even if it was made from domestic uranium source targets, loaded into a generator manufactured in the United States and eluted in the United States. *Id.*

46. Curium submitted a comment letter on September 15, 2025 (CMS-1834-P) challenging the domestic sourcing add-on payment. *See* Letter from Steve Barbera, Vice President of Market Access, Curium Pharma, to Dr. Mehmet Oz, Administrator, Centers for Medicare & Medicaid Services (Curium Letter) (Sept. 15, 2025), https://www.regulations.gov/document/CMS-2025-0306-2538. As Curium explained, the add-on payment would present numerous practical problems and would not serve CMS's statutory goals. *Id.*

47. Among other defects in the proposed rule, Curium noted that no domestically produced Tc-99m was currently available in the United States under the agency's definition—nor would any qualify until 2028 at the earliest. And the add-on payment would do nothing to ensure equitable payments to hospitals because radiopharmacies sell Tc-99m radiolabeled doses to hospitals at standard industry rates that do not vary based on the geographic origin of the Mo-99 used. A hospital purchasing a Tc-99m radiolabeled dose pays the same prevailing market price whether the Mo-99 was irradiated domestically or abroad, and the add-on is paid to the hospital

rather than passed up the supply chain to the producer. As a result, the add-on would not correct any actual disparity in the cost hospitals incur, would not flow to the domestic producers it purports to support, and would instead simply confer a taxpayer-subsidized market advantage to manufacturers of Tc-99m generators with access to domestic Mo-99.

48. In the CY 2026 Final Rule, CMS finalized the add-on payment without modification. 90 Fed. Reg. 53,448, 53,751-54 (Nov. 25, 2025). CMS again offered just a single justification for the add-on payment: that DOE had determined that "artificially low, foreign government-subsidized prices have created a disincentive for domestic investments in Mo-99 production infrastructure" and resulted in a "payment inequity." *Id.* at 53,752.

49. Although CMS "recognize[d] that domestically produced Mo-99 is not yet available," it stated that it was "better to have a regulatory framework for this policy in place for when domestic production of Mo-99 begins." *Id.* at 53,753. CMS provided no cost data supporting the $10 amount, no explanation of how it arrived at that figure, and no independent rationale for adopting DOE's recommended definition of a "domestically produced" dose.

50. In promulgating its final rule, CMS also offered no substantive response to several issues Curium raised in its comment on the proposed rule. *See id.* at 53,752-54. Specifically, the agency offered no response to concerns that the proposed definition of a "domestically produced dose of Tc-99m" would be impracticable for hospitals, which typically do not track the geographic origin of the Mo-99 used to produce the Tc-99m doses that they purchase. Nor did the agency respond to Curium's explanation in its comment that, given industry competition and long-term supply contracts, end-user providers would continue to pay the same price for Tc-99m radiolabeled doses regardless of the origin of the Mo-99 used to produce them, and so the add-on payment would not compensate providers for any pricing disparity.

51. The CMS add-on payment for domestically produced Tc-99m replaced an earlier add-on payment available for Tc-99m derived from non-highly enriched uranium (non-HEU). *See id.* at 53,751-52. While CMS calibrated the add-on payment for non-HEU-derived Tc-99m based on the documented marginal cost of non-HEU production relative to HEU-based production, the agency performed no similar analysis before adopting the add-on payment in the CY 2025 OPPS Final Rule or finalizing its eligibility in the CY 2026 OPPS Final Rule. *Compare id.* and 89 Fed. Reg. at 94,257-58*, with* 77 Fed. Reg. 68,210, 68,316 (Nov. 15, 2012). The non-HEU add-on payment further relied on the American Medical Isotopes Production Act's (AMIPA) non-HEU production goals and included a sunset tied to a joint certification by the Secretaries of Energy and HHS that sufficient non-HEU Mo-99 supply existed to meet U.S. patient needs, issued under AMIPA Section 3174, Pub. L. No. 112-239. That certification was issued in December 2021, and the non-HEU add-on payment ended effective December 31, 2025. CMS's decision to adopt the add-on payment for domestically produced Tc-99m invokes no similar statutory authority, includes no certification requirement, and has no defined sunset period. Nor does it rely on any documented cost differential between domestically and foreign-produced Tc-99m; indeed, no Tc-99m derived from domestically irradiated Mo-99 is commercially available.

52. The CMS add-on payment is codified at 42 C.F.R. § 419.49, and became effective January 1, 2026.

***The CMS Add-On Payment Rule and DOE Loan Cause Existential Harm to Curium's Business***

53. The CMS add-on payment rule and the DOE direct loan to SHINE each independently cause Curium grave competitive harm. Together, they operate as a coordinated federal effort to restructure the domestic Mo-99 market around a single, federally subsidized producer.

54. On the supply side, the DOE loan gives SHINE $263 million in capital to enter the Mo-99 market with the only facility that will benefit from the gerrymandered subsidy CMS's add-on payment offers. After 13 years and over $1 billion in expenditures, SHINE has thus far been unable to complete its facility without a government subsidy of this magnitude—including, on information and belief, private loans and previous federal support.

55. On the demand side, the CMS add-on payment creates a structural payment differential to the sole benefit of SHINE that disadvantages every manufacturer whose Mo-99 is irradiated outside the United States, regardless of how much of its sourcing, production, and distribution is otherwise domestic.

56. Critically, the add-on payment compensates hospitals differently for otherwise identical end products based on the location of upstream Mo-99 target irradiation, not their cost. The add-on does *not* compensate hospitals for a documented higher acquisition cost, but instead pays them incremental dollars solely because of where Mo-99 targets were irradiated. A hospital that purchases a radiolabeled Tc-99m dose derived from domestically irradiated Mo-99 will receive the add-on payment no matter the price it pays for that dose. As Curium explained to CMS in its comment, industry competition and existing contracts set a standard price for radiolabeled Tc-99m doses regardless of their origin. Yet even a hospital that pays that standard price for a dose derived from domestically irradiated Mo-99 will receive the add-on payment. *See* Curium Letter, *supra*. The payment is thus untethered to any actual cost difference and is therefore not a payment equity adjustment in any meaningful sense.

57. Because, based on the current circumstances, SHINE's unproven Mo-99 production process is the only one that would qualify on every dose, SHINE would be the sole beneficiary of that differential if its process ultimately proves successful.

58. Either action standing alone would cause grave competitive harm to Curium. Operating together, they amount to a government-backed effort to displace established suppliers in favor of a single producer that is unproven yet federally preferred.

59. SHINE is the only company to have received federal support to develop domestic Mo-99 production that has not abandoned the effort, and through its Lantheus acquisition it is now the only prospective vertically integrated domestic producer of both Mo-99 and Tc-99m generators. The competitive consequences of the CMS rule and the DOE loan together therefore fall most acutely on Curium, which is the largest supplier of Tc-99m generators to the U.S. market and whose manufacturing process, involving European reactor irradiation of Mo-99 targets, is foreclosed from qualifying for the add-on payment under 42 C.F.R. § 419.49(b). SHINE is the only Mo-99 producer who will benefit from the add-on payment assuming its Chrysalis facility is completed and operational.

60. Mo-99 and the Tc-99m derived from it are clinically undifferentiated and therefore fungible. A Tc-99m dose performs identically in a diagnostic procedure regardless of which producer supplies the underlying Mo-99 or where those Mo-99 targets were irradiated, and the generators of qualified suppliers meet the same baseline quality and reliability specifications. Because doses of Tc-99m are undifferentiated and fungible, an individual hospital's purchasing decision will likely turn exclusively on their effective price accounting for Medicare payment rates. Any government action that systematically reduces the relative price of one producer's product therefore presumptively dictates which supplier hospitals and radiopharmacies will choose.

61. The CMS add-on payment creates a financial incentive for a hospital to purchase finished doses of radiopharmaceutical products that qualify for the add-on payment. The $10 per-

dose add-on gives hospitals an additional $10 in Medicare payment for each qualifying dose derived from SHINE's domestically produced Mo-99, a payment advantage not available for clinically indistinguishable doses derived from Curium's Mo-99. Because the add-on attaches to each qualifying dose even though reimbursement for the Tc-99m radiolabeled dose is generally packaged into the payment for the diagnostic procedure, a hospital acting in its own financial interest would have little reason, at least for its Medicare patients, to choose doses that do not qualify for the add-on payment over doses that do. The CMS add-on payment thus poses an existential threat to Curium's business, creating a structural price disadvantage that makes its radiopharmaceutical products commercially nonviable.

62. CMS's gerrymandered definition of a "[d]omestically produced dose of Tc-99m"—which the agency adopted at DOE's recommendation, 90 Fed. Reg. at 53,752—also forecloses Curium from modifying its business operations to qualify its products for the add-on payment because, as CMS itself recognizes, "domestically produced Mo-99 is not yet available." *Id.* at 53,753. Existing research reactors in the United States either operate on schedules too unreliable for commercial supply or lack radiochemistry facilities required to process significant volumes of Mo-99. SHINE's experimental Chrysalis facility—now a decade and nearly a billion dollars into construction—is the only facility in the United States currently planned to be capable of irradiating uranium for Mo-99 production at commercial scale.

63. Nor is any alternative domestic source of Mo-99 available to Curium. Currently, no domestically irradiated Mo-99 is commercially available. To obtain Mo-99 for use in its generators that would meet the requirements for the CMS add-on payment, Curium sought to negotiate with SHINE to purchase Mo-99 that would be produced at the Chrysalis facility. SHINE refused to enter any such arrangement at a commercially viable price, instead demanding Curium pay

approximately three times the cost Curium currently incurs to produce Mo-99 itself. Thus, even though the bulk of Curium's production process employing hundreds of workers is located in the United States, no commercially viable avenue exists for Curium to meet CMS's standard for domestic Tc-99m production.

64. The DOE loan independently harms Curium by subsidizing a direct competitor's entry into the market as the only Mo-99 producer that could avail itself of the CMS add-on payment. After more than 13 years of development, several missed construction deadlines, and a billion dollars expended, SHINE has been unable to complete its Chrysalis facility and therefore has not produced a single commercial unit of Mo-99. SHINE has acknowledged that it could not finish the project without an additional capital infusion, and the DOE loan supplies it, presumably at a below-market interest rate. Without this subsidy, SHINE could not complete its facility or become a viable self-supplier of Mo-99, much less the only such producer eligible to benefit from the CMS add-on payment.

65. Because Curium is currently the leading supplier of domestic Tc-99m generators, nearly every Tc-99m generator that SHINE sells is a generator that Curium does not. The DOE loan therefore harms Curium in two ways. First, it enables SHINE to potentially enter the Mo-99 market and achieve vertical integration, and therefore to compete at a level of production that would otherwise be impossible absent this federal subsidy. Second, because the loan offsets SHINE's construction costs and ramp-up losses, it allows SHINE to enter the market at subsidized prices below its real costs. At peak capacity across all of its production units, SHINE projects that its Chrysalis facility will supply approximately one-third of global Mo-99 demand. The result is a massive diminution in Curium's business that jeopardizes its ability to operate in the United States market.

66. In combination, the CMS add-on payment and the DOE loan make it effectively impossible for Curium to compete. Because Mo-99 and the Tc-99m derived from it are clinically undifferentiated and commercially fungible, hospital purchasing decisions turn exclusively on price. Any government action that systematically reduces the relative price of one producer's product therefore dictates which supplier hospitals and nuclear pharmacies will choose. The CMS add-on and DOE loan, operating together, do exactly that as a matter of economic logic.

67. Indeed, Curium has already incurred substantial economic harm as a result of the CMS add-on payment and DOE loan. Supply contracts in the radiopharmaceutical industry are negotiated for multi-year terms well in advance, and the uncertainty created by the CMS rule has already begun to erode Curium's customer commitments. Curium's distribution partners have indicated that they are reluctant to renew their long-term supply contracts with Curium in light of the add-on payment that would be available to hospitals and SHINE's anticipated completion of its Chrysalis facility. They have further insisted on contractual provisions that would materially alter the contract, including by lowering purchasing commitments if domestically irradiated Mo-99 becomes available from other sources. Thus, Curium's customers recognize that the CMS add-on payment and DOE loan threaten the competitive viability of Curium's products and have already begun to adjust their contracting practices, to Curium's detriment, as a result.

68. Moreover, because there are only a handful of research reactors capable of irradiating Mo-99 targets, which decay too quickly to be stored for long periods, Curium must enter into multi-year contracts with research reactors with committed purchase obligations to guarantee the availability of space in their reactors. Curium's lost and imperiled customer commitments thus threaten its ability to enter into contracts for the purchasing volumes that sustain the global Mo-99 supply network on which the domestic Tc-99m supply chain depends.

69. The agencies' decision to install SHINE as the favored domestic producer also carries serious consequences for the integrity of the supply chain for treatments derived from Mo-99, and therefore for the countless patients who rely on those products. Replacing a resilient, multi-reactor supply network with a supply network dependent on a single, unproven facility—one whose process has never been validated at commercial scale—would render the entire supply chain for Mo-99 and Tc-99m dependent on the stability of SHINE's Chrysalis facility. Should that supply chain be disrupted, patients will face delayed or canceled diagnostic procedures and may be forced into more expensive alternatives. A dose of rubidium-82 for a PET scan to assess myocardial perfusion, for example, costs approximately $600—roughly 17 times the $35 approximate cost of a Tc-99m radiolabeled dose for a comparable cardiac SPECT procedure.

***The DOE Loan Exceeds the Agency's Statutory Authority and Is Arbitrary and Capricious***

70. The DOE loan is arbitrary, capricious, and contrary to law. The Energy Policy Act authorizes loan guarantees—not direct loans—for projects that advance American energy policy, subject to both substantive and procedural safeguards to ensure the program is fairly administered. *See* 42 U.S.C. § 16512. Loan guarantees under the Act's energy dominance financing provisions are, by statute, even more limited. DOE's direct loan to SHINE violates the Act in multiple ways, and falls far short of the reasoned and reasonable decisionmaking the APA demands.

71. First, because SHINE's Chrysalis facility has nothing to do with "energy infrastructure," 42 U.S.C. § 16517(a), the Energy Policy Act's energy dominance financing provisions do not authorize a loan guarantee for that project. Under the Energy Dominance Financing Program, loan guarantees are permissible "*only* for projects that[] (1) retool, repower, repurpose, or replace energy infrastructure that has ceased operations; (2) enable operating energy infrastructure to increase capacity or output; or (3) support or enable the provision of known or

forecastable electric supply at time intervals necessary to maintain or enhance grid reliability or other system adequacy needs." *Id.* (emphasis added). Congress's use of "[t]he word 'only' places a strict limit upon the *categories* of [projects] that are covered." *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 232 (1992); *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 545 (2021) ("Expressing one item of an associated group or series excludes another left unmentioned." (cleaned up)).

72. SHINE's Chrysalis facility meets none of those statutory criteria. It does not "retool, repower, repurpose, or replace energy infrastructure that has ceased operations," 42 U.S.C. § 16517(a)(1)—it is a new, greenfield development that employs a new Mo-99 production process. Because the Chrysalis facility is intended to produce only medical radioisotopes—not energy—it does not "increase capacity or output" of any energy infrastructure. *Id.* § 16517(a)(2). Nor, for the same reason, will it "support or enable the provision of known or forecastable electric supply." *Id.* § 16517(a)(3). The facility's function is to produce "medical isotopes," not energy. DOE Press Release, *supra*. It accordingly is ineligible for Energy Dominance Financing Program funds.

73. Indeed, DOE's announcement of the loan makes no reference whatsoever to energy output or production. Instead, it asserts that the loan's purpose is to support the construction of a "high-volume medical isotope production facility." *Id.* DOE has no statutory authority to make Energy Dominance Financing Program loans to projects for the production of medical radioisotopes.

74. That the Energy Policy Act defines "energy infrastructure" to include facilities for producing "critical minerals" only confirms that the SHINE loan exceeds DOE's statutory authority. The Energy Policy Act defines "critical minerals" to include only specific minerals designated by the Secretary of the Interior following notice and comment, typically those involved

in energy production. 42 U.S.C. § 16513(b)(13); *see* 30 U.S.C. § 1606(a)(3)(A), (c). Mo-99 is not a designated critical mineral. *See* Final 2025 List of Critical Minerals, 90 Fed. Reg. 50,494, 50,496-97 (Nov. 7, 2025). By limiting critical minerals to those formally designated by a defined agency process, the statute precludes loans designed to further the production of other, undesignated products like Mo-99.

75. Nor would SHINE's Chrysalis facility satisfy the subject-matter requirements for the Act's renewable energy provisions (even if DOE had invoked that authority), which allow loan guarantees for energy projects that, among other requirements, "avoid, reduce, utilize, or sequester air pollutants or anthropogenic emissions of greenhouse gases." 42 U.S.C. § 16513(a)(1). The Chrysalis facility is not a renewable energy project. It will produce no energy whatsoever, and it plays no role in reducing or sequestering air pollutants or greenhouse gases.

76. Second, the Energy Policy Act authorizes DOE to make only "loan guarantee[s]." 42 U.S.C. § 16511(4)(A); *see id.* § 16517(a) (authorizing DOE only to "make guarantees, including refinancing"). It does not permit DOE to make direct loans to private parties like the one DOE has approved for SHINE. Under the statute, a "guarantee" is defined to "ha[ve] the meaning given the term 'loan guarantee' in section 661a of title 2." *Id.* § 16511(4)(A). Section 661a, in turn, defines a "loan guarantee" to mean "any guarantee, insurance, or other pledge with respect to the payment of all or a part of the principal or interest on any debt obligation of a non-Federal borrower to a non-Federal lender." 2 U.S.C. § 661a(3). Thus, when DOE makes a loan guarantee under the Energy Dominance Financing Program, it may do no more than "guarantee" or "insur[e]" payment of all or part of a private borrower's loan from a "non-Federal lender." *Id.* Nothing in the Energy Policy Act authorizes DOE to make a direct loan from the agency to a private borrower like SHINE.

77. Indeed, Section 661a expressly distinguishes between a "loan guarantee" and a "direct loan." *See id.* § 661a(1), (3). While a loan guarantee serves to guarantee or insure a private borrower's existing private debt, a " 'direct loan' means a disbursement of funds by the government to a non-Federal borrower under a contract that requires the repayment of such funds." *Id.* § 661a(1). "The contrast between these two [definitions] makes clear that Congress knows how" to authorize direct loans to private borrowers when it chooses. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010). The Energy Policy Act and the statutory definition of "guarantee" it incorporates thus unequivocally bar direct loans, and DOE's decision to grant SHINE a direct loan exceeds the agency's statutory authority.

78. Other provisions of the Act confirm that the "guarantees" authorized by the statute do not include direct loans. In its default provisions, the statute provides that in the event of default by the borrower, "the holder of the guarantee shall have the right to demand payment of the unpaid amount from the Secretary." 42 U.S.C. § 16512(g)(1)(A). That is, the statute expressly contemplates that the agency will guarantee the borrower's loan from another private party—"the holder of the guarantee"—not make a direct loan of federal funds to a borrower. Other statutory provisions repeatedly refer to an "obligation" "guaranteed" by the agency. *See, e.g.*, *id.* § 16512(d)(1)(A), (d)(2), (g)(1)(A)-(B), (g)(3). No statutory language suggests that DOE has authority to provide direct loans instead or provides any standards or procedures for the making and repayment of direct loans.

79. Third, to the extent DOE asserts authority to make direct loans having nothing to do with energy production or policy, that extraordinary claim violates the major questions doctrine. Under that doctrine, an agency claiming power over matters of vast " 'economic and political significance' " must "point to 'clear congressional authorization' to regulate in that manner." *West*

*Virginia v. EPA*, 597 U.S. 697, 730-32 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (first quotation), and *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (second quotation)). "'[B]oth separation of powers principles and a practical understanding of legislative intent'" make clear that Congress does not "delegate[] 'highly consequential power' through ambiguous language." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (first alteration in original) (quoting *West Virginia*, 597 U.S. at 723-24). If Congress had wanted to allow DOE to repurpose a billion dollars in specifically appropriated funds for purposes having nothing to do with the agency's statutory mandate, it would have said so expressly.

80. Moreover, in other statutes, "Congress has directly spoken to the issue here," *Brown & Williamson*, 529 U.S. at 133: incentives for domestic manufacturing generally, and for domestic manufacturing of radiopharmaceuticals specifically. *See, e.g.*, Build America, Buy America Act of 2021, Pub. L. No. 117-58, 135 Stat. 1294 (codified at 41 U.S.C. § 8301 *et seq.*); 10 U.S.C. § 4862; 26 U.S.C. §§ 45(b)(11)(A), 48(a)(14)(A)-(B). In AMIPA, Congress expressly provided for federal "assistance" for "the development of fuels, targets, and processes for domestic molybdenum-99 production that do not use highly enriched uranium" in the form of a uranium lease and take-back program. American Medical Isotopes Production Act of 2012 § 3173(b), Pub. L. No. 112-239, 126 Stat. 2211, 2212. That is, Congress has enacted a detailed statutory scheme that balances federal interests in domestic manufacturing against other relevant factors like free trade and competition.

81. Congress's choice to place constraints on such federal assistance—both by limiting it to low-enriched-uranium processes and by declining to provide for direct payments—is powerful evidence that the Energy Dominance Financing Program did not authorize DOE to breeze past

those constraints *sub silentio*. *See Brown & Williamson*, 529 U.S. at 143. And allowing DOE to repurpose a billion dollars appropriated for narrowly defined energy-infrastructure projects would mark a "transformative expansion in its regulatory authority" to the field of pharmaceutical manufacturing. *West Virginia*, 597 U.S. at 724 (cleaned up).

82. Fourth, the DOE loan also contravenes the statutory guardrails Congress has imposed on Energy Dominance Financing Program loan guarantees to ensure that the program is administered fairly and furthers America's energy policy. In the terms and conditions that govern all Energy Policy Act loan guarantees, including those made under the Energy Dominance Financing Program, the statute requires that the agency "shall certify that political influence did not impact the selection of the project." 42 U.S.C. § 16512(r). Nowhere in DOE's announcement of the loan or in any published agency materials has DOE made that required certification for the SHINE loan. That failure independently renders DOE's loan selection unlawful.

83. Independent of DOE's statutory violations—any one of which would require setting the DOE loan aside—the agency's loan approval is arbitrary and capricious. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Among other grounds, the DOE loan is arbitrary and capricious because the agency "relied on factors which Congress has not intended it to consider" and "entirely failed to consider" important aspects of the problem before it. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

84. In announcing its loan to SHINE, DOE relied on two factors either irrelevant to or outright inconsistent with the agency's statutory mandate under the Energy Dominance Financing Program—and nothing else. For one, the agency asserted that the Chrysalis facility "will establish

the only domestic commercial supply of molybdenum-99." DOE Press Release, *supra*. But the Energy Dominance Financing Program authorizes projects that increase the output of "energy," not medical radioisotopes. 42 U.S.C. § 16517(a). Congress did not authorize DOE to prioritize protectionism in the medical radioisotope industry in allocating limited Energy Dominance Financing Program funds. Second, DOE asserted that the loan would "further commercialize a project long supported by DOE." DOE Press Release, *supra*. That justification defies the Energy Policy Act's prohibition on such political favoritism in selecting projects for loan guarantees. *See* 42 U.S.C. § 16512(r). DOE's press release offers no other justification for the selection of the Chrysalis project, the amount of the direct loan, or DOE's determination that Chrysalis qualifies for the Energy Dominance Financing Program.

85. DOE also entirely failed to consider important aspects of the problem. DOE's press release reflects no consideration of the reliance interests of other Mo-99 suppliers, an "omission [that] alone renders [the DOE loan] arbitrary and capricious." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Nor did DOE grapple with the extraordinary practical difficulties facing SHINE and the untested Mo-99 production process planned for the Chrysalis facility. SHINE's construction efforts have already burned through hundreds of millions of federal dollars without producing a single commercial unit of Mo-99. DOE's decision to pour an additional $263 million into the years-delayed project without reasoned consideration of its viability was arbitrary and capricious.

86. The DOE loan is a final agency action reviewable under the APA. It "mark[s] the consummation of the agency's decisionmaking process" because it reflects DOE's final decision to award a direct loan to SHINE on specified contractual terms. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted). And it creates "rights" and "obligations"

because it entitles SHINE to receive loan payments that it is obligated ultimately to repay. *Id.* (citation omitted). The Court should hold the DOE loan unlawful and set it aside.

***The CMS Add-On Payment Rule Exceeds the Agency's Statutory Authority and Is Arbitrary and Capricious***

87. CMS's add-on payment rule exceeds the agency's statutory authority and is *ultra vires*. It is also arbitrary and capricious. CMS's authority to make "other adjustments as determined to be necessary to ensure equitable payments" under the OPPS serves a specific, targeted function: allowing the agency to account for disparities in the relative costs that hospitals face. 42 U.S.C. § 1395*l*(t)(2)(E). It does not authorize CMS to contort the OPPS to pursue another agency's unrelated policy objectives. An add-on payment designed to prop up a favored U.S. company falls far outside the agency's statutory mandate.

88. As a matter of both text and precedent, the add-on payment for Tc-99m derived from domestically irradiated Mo-99 is unlawful. Where Congress has chosen to give agencies authority to subsidize domestic production, it has done so expressly—by enacting numerous statutes that balance domestic-manufacturing incentives with principles of free competition. And there is no indication that Congress intended, *sub silentio*, to grant CMS similar authority over a matter of such economic and political significance. Additionally, CMS's final rule adopting the add-on payment was arbitrary and capricious on numerous grounds. The agency failed to meaningfully respond to public comments; relied on factors Congress did not intend it to consider; ignored reliance interests; and outsourced its regulatory authority to another agency when it accepted DOE's gerrymandered domestic-production definition with no reasoning at all.

89. Section 1833(t)(2)(E) of the Social Security Act, 42 U.S.C. § 1395*l*(t)(2)(E), authorizes certain payment adjustments within the OPPS framework. Under that provision, as part of its data-driven annual adjustments to payment rates, the agency makes "outlier adjustments";

"transitional pass-through payments"; "temporary additional payments for non-opioid treatments for pain relief"; and, as relevant here, "other adjustments as determined to be necessary to ensure equitable payments, such as adjustments for certain classes of hospitals."

90. Read in context, Section 1833(t)(2)(E) is a tool to address reimbursement disparities, not a vehicle for setting industrial policy unrelated to hospital costs. *See, e.g.*, *Amgen Inc. v. Smith*, 357 F.3d 103, 117 (D.C. Cir. 2004) (provision authorizes limited "adjustments" within the OPPS payment accuracy framework, "not total elimination or severe restructuring of the statutory scheme"). Indeed, the statute's reference to "adjustments for certain classes of hospitals," 42 U.S.C. § 1395*l*(t)(2)(E), reflects that equitable adjustments are those that ensure hospitals receive payments that equitably compensate them based on their relative costs. Reading the equitable-adjustment provision otherwise would eviscerate the statutory requirement that CMS set payment rates based on "data" reflecting "hospital costs." *Id.* § 1395*l*(t)(2)(C); *see also id.* § 1395*l*(t)(3) (providing detailed, data-driven formula for computation of payment rates).

91. Bedrock interpretative principles confirm the statute's plain meaning. "[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'" *Fischer v. United States*, 603 U.S. 480, 487 (2024) (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). "And under the related canon of *ejusdem generis*, 'a general or collective term at the end of a list of specific items' is typically 'controlled and defined by reference to' the specific classes that precede it." *Id.* (cleaned up) (quoting *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022)). Thus, when a phrase like "other adjustments" appears in the last item in a list, 42 U.S.C. § 1395*l*(t)(2)(E), "[o]ne way to discern the reach of [the 'other adjustments'] clause is to look for guidance from whatever examples come before it," *Fischer*, 603 U.S. at 487.

92. Here, every category of adjustment listed in Section 1395*l*(t)(2)(E) that precedes "other adjustments … necessary to ensure equitable payments," *id.*, relates to the relative costs hospitals actually incur, not speculation about the "true cost of production" that would-be market entrants might face, 90 Fed. Reg. at 53,752. Outlier adjustments, as defined in the statute, address situations where a hospital's cost to provide a given service significantly exceeds "the applicable medicare OPD fee schedule." 42 U.S.C. § 1395*l*(t)(5)(A)(i)(I). Transitional pass-through payments provide an additional, temporary payment for certain new, often high-cost items during which time additional data is collected to set future payments. *Id.* § 1395*l*(t)(6). And temporary additional, separate payments for certain non-opioid treatments for pain relief remove a financial disincentive for the use of opioid-free pain treatments. *See id.* § 1395*l*(t)(16)(G). The canons of *noscitur a sociis* and *ejusdem generis* accordingly require reading CMS's authority to make other equitable adjustments to be "similarly limited" to adjustments that ensure payments to hospitals are equitable, *Fischer*, 603 U.S. at 489, not those that promote "domestic investments," 90 Fed. Reg. at 53,752.

93. The legislative history reinforces this commonsense construction of CMS's equitable-adjustment authority. In the conference report for the Balanced Budget Act of 1997, which enacted the OPPS framework, Congress urged CMS "to examine whether an adjustment is warranted for those Eye and Ear specialty hospitals that received payments under a different blend formula for cost reporting periods beginning on or after October 1, 1988 and before January 1, 1995." H.R. Rep. No. 105-217, at 785 (1997) (Conf. Rep.). That is, Congress intended the adjustments available under Section 1395*l*(t)(2)(E) to remedy inequities that might result from applying a standardized payment schedule to hospitals that faced differing cost structures. Nothing in the Social Security Act's text or history suggests that CMS enjoys a free-floating authority to

advance the unrelated policy goals of another agency—like encouraging domestic Mo-99 production—under the guise of "equitable" payments.

94. Reading Section 1395*l*(t)(2)(E) to authorize CMS to wield its Medicare-reimbursement authority to advance unrelated policy goals would also violate the major questions doctrine. For at least two independent reasons, the major questions doctrine precludes CMS's unbridled interpretation of its equitable-adjustment authority here.

95. First, CMS's claimed authority in adopting the add-on payment here is extraordinary and atypical. Nearly every hospital in the country relies on Medicare payments, and if CMS could adjust payment rates by fiat to favor particular products, suppliers, or industries to advance unrelated policy goals, it would mark a "transformative expansion in its regulatory authority." *West Virginia*, 597 U.S. at 724 (cleaned up) (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

96. Under the name of "equitable payments," 42 U.S.C. § 1395*l*(t)(2)(E), the agency could, for example, enact environmental regulations on the theory that pharmaceuticals produced using energy from coal-fired power plants impose inequitable external costs. *Cf. West Virginia*, 597 U.S. at 732-35 (holding, under major questions doctrine, that even the Environmental Protection Agency lacked authority to require coal-fired power plants to subsidize renewable energy production). Or it could adjust payment rates to make economically nonviable pharmaceuticals produced only by companies that declined to require their employees be vaccinated, reasoning that unvaccinated patients impose inequitable costs on the healthcare system. *Cf. NFIB v. OSHA*, 595 U.S. 109 (2022) (holding, under major questions doctrine, that even OSHA lacked authority to impose a workplace vaccine mandate). As the Supreme Court has

explained, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

97. The agency's decision here to make Tc-99m produced with foreign-irradiated Mo-99 targets commercially nonviable vastly oversteps its subject-matter purview. Thus, "there is every reason to hesitate before concluding that Congress meant to confer on [CMS]" the authority to wield its equitable-adjustment power to achieve policy objectives unrelated to accurate reimbursement of hospital costs. *West Virginia*, 597 U.S. at 725 (cleaned up).

98. Second, as discussed for the DOE loan above, "Congress has directly spoken to the issue here" by enacting a detailed statutory scheme governing incentives for domestic manufacturing. *Brown & Williamson*, 529 U.S. at 133. In AMIPA (for radiopharmaceuticals) and many other statutes (for other industries and more generally), Congress has acted to encourage manufacturers to make products within the United States with tax credits and other incentives. *See, e.g.*, Build America, Buy America Act of 2021 § 70911, 135 Stat. at 1295; 10 U.S.C. § 4862; 26 U.S.C. §§ 45(b)(11)(A), 48(a)(14)(A)-(B).

99. In so doing, Congress "conspicuously and repeatedly declined to enact" hospital add-on payments to incentivize domestic manufacturing itself. *West Virginia*, 597 U.S. at 724; *see also Brown & Williamson*, 529 U.S. at 143 (rejecting claim that FDA had authority to regulate under ambiguous statutory language where other statutes "more specifically address the topic at hand"). It is thus "highly unlikely" that Congress intended to give CMS unbounded authority by vague implication in a field in which Congress has comprehensively legislated. *Brown & Williamson*, 529 U.S. at 160. CMS's claim that a long-unremarked provision for OPPS adjustments to ensure "equitable payments" authorized it to reshape the competitive landscape for radioisotope production flouts common sense and extensive Supreme Court precedent.

100. Even if the add-on payment fell within CMS's statutory authority, which it does not, the final rule adopting it independently falls well short of the reasoned and reasonable decisionmaking the APA demands, for multiple independent reasons.

101. First, in adopting the add-on payment, CMS relied principally "on [a] factor[] which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43: supporting "the domestic supply chain for Mo-99 and Tc-99[m]," 90 Fed. Reg. at 53,752; *see also* 89 Fed. Reg. at 59,378 (justifying the add-on payment on the ground that "artificially low, government-subsidized prices have created a disincentive for investments in Mo-99 production infrastructure, and they also created a barrier to entry for new producers, including U.S. companies"). Nothing in the Social Security Act authorizes CMS when setting Medicare payment rates to consider the incentives for Mo-99 production infrastructure, market factors that allegedly pose a barrier for new producers, or the competitive conditions facing U.S. companies.

102. Nor does competition from companies using Mo-99 targets irradiated outside the United States render inequitable the payments hospitals receive for diagnostic procedures utilizing Tc-99m radiolabeled doses derived from domestically irradiated Mo-99. Tc-99m doses function identically regardless of their geographic origin, and for that reason radiopharmacies price them at industry-standard rates. Simply put, there is no disparity in the relative costs hospitals face for the add-on payment to remedy.

103. Second, CMS provided no substantive reasoning for setting the amount of the add-on payment at $10 or adopting DOE's recommended definition of "a domestically produced dose of Tc-99m." As to the amount of the add-on payment, CMS referenced the OECD/NEA full-cost recovery methodology. But the agency provided no analysis of how that methodology, developed to address the cost of irradiation services at European government-owned reactors, applies to

SHINE's accelerator-based domestic production process or the costs that hospitals would actually face when purchasing domestically produced Tc-99m. *See* 90 Fed. Reg. at 53,753-54. CMS commissioned no data, performed no calculations, and undertook no analysis of applicable cost differentials. Instead, CMS simply applied the same $10 figure it had previously used for non-HEU-produced Mo-99. *See id.* at 53,751-52. And it did so even though no domestically produced Tc-99m currently exists under the agency's definition of that term, and thus there is no evidentiary basis for concluding that $10 accounts for the "true cost of production." *Id.* at 53,752-53. Indeed, Curium raised that issue in its comment to CMS, and the agency offered no substantive response. *See id.* at 53,753.

104. As to the definition of "a domestically produced dose of Tc-99m," CMS provided no reasoning at all for its choice. Instead, CMS simply stated that "DOE/NNSA recommended" the definition CMS adopted. *Id.* But relying on the unreasoned recommendation of another agency, while providing no explanation of the basis for that recommendation or the agency's decision to accept it, is *per se* arbitrary and capricious. *See City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006) (an agency "must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise"). And that is particularly true where, as here, the agency making the recommendation has no substantive expertise. DOE has no role in healthcare, no expertise in estimating the costs hospitals face to provide medical services, and no statutory mandate to determine which payments to hospitals are "equitable." CMS's unquestioning reliance on DOE's recommended definition is both independently arbitrary and capricious and underscores that incentives for domestic manufacturing—rather than equitable payments to hospitals—are the object of CMS's final rule.

105. Third, CMS failed to consider important aspects of the problem before it, including those raised in comments to which the agency offered no substantive response. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (agency rule is arbitrary and capricious where the agency fails to "respond to 'relevant and significant' comments" (quoting *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 225 (D.C. Cir. 2007))). Among others, Curium raised two significant issues in its comment to which CMS offered no substantive response: (1) that the rule would be impracticable to administer because "manufacturers will be likely to mix domestic and non-domestic Mo-99 when producing Tc-99m generators," such that "hospitals are unlikely to know if the radiopharmaceutical they are dispensing came from a generator with 50% domestic Mo-99"; and (2) "providers will not pay more [for domestically produced Tc-99m], meaning there will be no need for an add-on payment to providers" to compensate them for their costs. Curium Letter, *supra*. CMS did not meaningfully engage with these concerns: CMS deferred the first to unspecified "future guidance" and rejected the second as insufficiently supported, without engaging its reasoning. *See* 90 Fed. Reg. at 53,751-54.

106. CMS's failure to meaningfully respond to comments was particularly arbitrary given that the agency invited commenters to provide insight in an area where the agency acknowledged it lacked sufficient information. In the CY 2025 Final Rule, which first announced the agency's decision to adopt the add-on payment, CMS stated that if "commenters have data showing that the price differential between domestically produced and foreign produced Mo-99 will be significantly more or less than $10, they may provide that data to CMS so we can consider it for CY 2026 OPPS rulemaking." 89 Fed. Reg. at 94,258. Indeed, because no domestically irradiated Mo-99 is commercially available, $10 cannot possibly reflect "the price differential between domestically produced and foreign produced Mo-99." *Id.* Nonetheless, without

addressing any comments concerning the amount of the add-on payment, or any additional data, the agency set the payment at $10.

107. Finally, CMS failed to account in any way for the reliance interests of manufacturers, providers, or patients in adopting an add-on payment that upends the market for Tc-99m. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (cleaned up). Here, the agency ended the longstanding add-on payment for non-HEU-produced Mo-99 and adopted one that categorically excludes the leading domestic producer (and all others) while creating a structural price advantage for a single producer. In so doing, CMS did not so much as mention the reliance interests of existing market participants like Curium, or consider the risks that patients would face from concentrating domestic Mo-99 supply in a single Tc-99m generator producer employing a novel and untested manufacturing process. "That omission alone renders [the CMS rule] arbitrary and capricious." *Id.*

108. The CMS add-on payment rule is a final agency action reviewable under the APA. It "mark[s] the consummation of the agency's decisionmaking process" because it is a final rule published in the Federal Register and codified in the Code of Federal Regulations. *Bennett*, 520 U.S. at 178 (citation and quotation marks omitted). And it creates "rights" and "obligations" because it entitles hospitals to receive defined OPPS payment amounts, including the add-on payment for a domestically produced dose of Tc-99m. *Id.* (citation omitted). The Court should hold the CMS add-on payment rule unlawful and set it aside.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act**
**(Declaratory/Injunctive Relief—DOE's decision to grant SHINE an Energy Dominance Financing Program loan exceeds the agency's statutory authority and is arbitrary, capricious, and an abuse of discretion)**

109. Curium realleges and incorporates by reference all prior and subsequent paragraphs.

110. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or is "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

111. Agency action is arbitrary and capricious when the agency relies on impermissible factors or fails to consider important factors, or gives an inadequate, implausible, or counterintuitive explanation for its decision. *See, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 663 (D.C. Cir. 2019); *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1056-57 (D.C. Cir. 2019).

112. Courts also must set aside agency action that is *ultra vires*. *See Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022).

113. The Energy Policy Act authorizes only loan "guarantees," 42 U.S.C. § 16513(a); it does not authorize DOE to make a "direct loan" to any private party. *See id.* § 16511(4); 2 U.S.C. § 661a(1)-(4). DOE's decision to grant a direct loan to SHINE thus exceeds the agency's statutory authority.

114. DOE's decision to grant an Energy Dominance Financing Program loan to SHINE also exceeds the statutory limits on that program. Loan guarantees under the Energy Dominance Financing Program are available "only for projects that[] (1) retool, repower, repurpose, or replace

energy infrastructure that has ceased operations; (2) enable operating energy infrastructure to increase capacity or output; or (3) support or enable the provision of known or forecastable electric supply at time intervals necessary to maintain or enhance grid reliability or other system adequacy needs." 42 U.S.C. § 16517(a). SHINE's Chrysalis facility does none of those things. If completed, it would produce only medical radioisotopes, not energy, and would do nothing to increase the capacity or output of energy infrastructure or enhance the reliability of the electrical grid.

115. DOE's radical reinterpretation of the Energy Policy Act to allow direct loans for projects unrelated to energy production also contravenes the major questions doctrine. Only express statutory authorization suffices to allow agencies to exercise power over matters of vast "economic and political significance," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (quoting *West Virginia*, 597 U.S. at 721), like DOE's repurposing of a billion dollars in energy financing appropriations for purposes wholly unrelated to energy production. No such express statutory language authorizes DOE's actions here.

116. In deciding to grant SHINE an Energy Dominance Financing Program loan, DOE also violated statutory safeguards designed to ensure that loan guarantees advance American energy policy rather than picking winners and losers in the marketplace. When granting a loan guarantee under the Energy Policy Act, "the Secretary shall certify that political influence did not impact the selection of the project." 42 U.S.C. § 16512(r). DOE has not published the required certification for the SHINE loan, and, on information and belief, political influence impacted the selection of the project.

117. DOE's decision to grant SHINE an Energy Dominance Financing Program loan is a final agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction" or "authority," *id.* § 706(2)(C), and *ultra vires*.

118. Even if DOE's decision to grant SHINE an Energy Dominance Financing Program loan were statutorily permissible (and it is not), that decision is arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A). The agency has provided no reasoned explanation supporting its decision; has considered factors related to the supply chain for radiopharmaceuticals that Congress has not authorized it to consider; and has ignored other important factors in its decisionmaking.

119. DOE's decision to grant SHINE an Energy Dominance Financing Program loan accordingly must be set aside.

### *SECOND CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act**
**(Declaratory/Injunctive Relief—CMS's Add-On Payment Rule exceeds the agency's statutory authority and is arbitrary, capricious, and an abuse of discretion)**

120. Curium realleges and incorporates by reference all prior and subsequent paragraphs.

121. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or is "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

122. Agency action is arbitrary and capricious when the agency relies on impermissible factors or fails to consider important factors, or gives an inadequate, implausible, or counterintuitive explanation for its decision. *See, e.g.*, *Am. Bankers Ass'n*, 934 F.3d at 663; *Cal. Cmtys. Against Toxics*, 928 F.3d at 1056-57.

123. Courts also must set aside agency action that is *ultra vires*. *See Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970.

124. CMS's domestic sourcing add-on payment exceeds its authority under Section 1833(t)(2)(E) of the Social Security Act, which authorizes OPPS payment equity adjustments, not domestic content requirements for Medicare-covered drugs. No statutory language authorizes geographic sourcing conditions on Medicare payment. Congress has granted such authority only through explicit, dedicated legislation, which it did not do here.

125. The domestic sourcing condition in 42 C.F.R. § 419.49, as finalized in the CY 2026 OPPS Final Rule, 90 Fed. Reg. at 53,751-54, is not a payment equity adjustment; it is a domestic content requirement imposed through the Medicare payment system. A Tc-99m radiolabeled dose used in a SPECT scan procedure is clinically and economically identical regardless of Mo-99 origin. Section 419.49(b)'s exclusion of Curium's downstream U.S. operations confirms the regulation targets supply chain provenance, not equitable payment for covered services.

126. CMS's radical reinterpretation of the Social Security Act to allow add-on payments designed to achieve policy objectives unrelated to the accurate compensation of hospitals for their costs of service also contravenes the major questions doctrine. Only express statutory authorization suffices to allow agencies to exercise power over matters of vast "economic and political significance," *Biden*, 600 U.S. at 502 (quoting *West Virginia*, 597 U.S. at 721), like CMS's use of its equitable-adjustment authority to dictate industrial policy. No such express statutory language authorizes CMS's actions here.

127. CMS's add-on payment rule is a final agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction" or "authority," *id.* § 706(2)(C), and *ultra vires*, *see Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970.

128. Even if CMS's add-on payment rule were statutorily permissible (it is not), the rule is arbitrary, capricious, and an abuse of discretion. *See* 5 U.S.C. § 706(2)(A). The rule lacks any

cost analysis supporting the $10 figure; fails to address competitive harm to existing manufacturers; was finalized before any qualifying domestic product existed; provides no reasoned explanation for the shift from a technology-based, globally applicable standard to a domestic geographic sourcing condition; and relies on an indirect hospital-level payment mechanism that CMS has not shown will reach Mo-99 producers or incentivize the domestic supply chain development the rule purports to advance.

129. CMS's add-on payment rule must accordingly be set aside.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiff requests judgment in its favor against Defendants as follows:

1. Declare that Defendants' decision to grant SHINE an Energy Dominance Financing Program loan was contrary to law;

2. Declare that the CMS Add-On Payment Rule was contrary to law;

3. Set aside DOE's decision to grant SHINE an Energy Dominance Financing Program loan;

4. Set aside the CMS Add-On Payment Rule;

5. Enjoin DOE from granting SHINE an Energy Dominance Financing Program loan or making payments to SHINE under any existing Energy Dominance Financing Program loan;

6. Enjoin CMS from adopting an add-on payment for domestically produced molybdenum-99 as defined in the CMS Add-On Payment Rule;

7. Award Plaintiff reasonable attorneys' fees and costs; and

8. Grant such other and further relief as the Court may deem appropriate.

Dated: November 2, 2026

Respectfully submitted,

*/s/ Benjamin C. Mizer*
Benjamin C. Mizer (D.C. Bar No. 499651)
Burden H. Walker (*pro hac vice* forthcoming)
Allison W. Shuren (*pro hac vice* forthcoming)
Daniel Yablon (D.C. Bar No. 90022490)
Jacqueline L. Degann (*pro hac vice* forthcoming)
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 942-5000
benjamin.mizer@arnoldporter.com
burden.walker@arnoldporter.com
allison.shuren@arnoldporter.com
daniel.yablon@arnoldporter.com
jackie.degann@arnoldporter.com

Clare A. Saunders (*pro hac vice* forthcoming)
ARNOLD & PORTER
KAYE SCHOLER LLP
500 Boylston St., 20th Fl.
Boston, MA 02116
Tel: (617) 351-8050
clare.saunders@arnoldporter.com

*Counsel for Plaintiff Curium US LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Federal Rule of Civil Procedure 4.

*/s/ Benjamin C. Mizer*

Benjamin C. Mizer (D.C. Bar No. 499651)
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
benjamin.mizer@arnoldporter.com